Judge McMahon '08 CIV 7046

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
AMALGAMATED LITHOGRAPHERS OF
AMERICA-LITHOGRAPHIC INDUSTRY
PENSION PLAN,

RECEIVED
AUG 07 2008
U.S.D.C. S.D. N.Y.
CASHIERS

                                        Plaintiff,

        -against-                                          **COMPLAINT**

UNZ & CO. INCORPORATED,

                                        Defendant.
----------------------------------------------------------------x


        Plaintiff, AMALGAMATED LITHOGRAPHERS OF AMERICA LITHOGRAPHIC

INDUSTRY PENSION PLAN (the "Plan"), by its attorneys, KENNEDY, JENNIK &

MURRAY, P.C., as and for its complaint against defendant UNZ & CO. INCORPORATED

("Unz") alleges as follows:


## INTRODUCTION

        1.        This is an action for withdrawal liability arising under the Employee Retirement

Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* and the Multi-

Employer Pension Plan Amendments Act ("MPPA"), 29 U.S.C. § 1381, to recover said

withdrawal liability as a result of the defendant's default on said withdrawal liability.

**PARTIES**

2.    The Plan is an "employee pension benefit plan" within the meaning of Section

3(2) and (3) of ERISA, 29 U.S.C. § 1002(2) and (3), a "multiemployer plan" within the meaning

of Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A), a "defined benefit plan" within the

meaning of Section 3(35) of ERISA, 29 U.S.C. § 1002(35), and is maintained for the purpose of

providing retirement and related benefits to eligible participants and beneficiaries. The Plan is a

jointly administered employee benefit trust fund, composed of an equal number of trustees from

union and management, established and maintained pursuant to Section 302(c)(5) of the Labor

Management Relations Act ("Taft-Hartley Act"), 29 U.S.C. § 186(c)(5). The Plan maintains its

office at 113 University Place, New York, New York, 10003.

3.    Unz is an "employer" within the meaning of Section 3(5) of ERISA, 29 U.S.C. §

1002(5).  Upon information and belief, Unz is a corporation within the laws of the State of New

Jersey and maintains its office and principal place of business at 201 Circle Drive North, Suite

104, Piscataway, New Jersey 08854.


**JURISDICTION AND VENUE**

4.    This Court has subject matter jurisdiction pursuant to § 502(a)(3)(B)(ii), (d)(i),

(e)(2) and (f) and § 4301(a), (c) and (d) of ERISA, 29 U.S.C. § 1132(a)(3)(B)(ii), (d)(i), (e)(2)

and (f)  and § 1451(a), (c) and (d), because the Plan maintains its office in New York County.


**FIRST CAUSE OF ACTION**

5.      Scott Printing Corp. ("Scott Printing"), was a member of the Metropolitan Lithographers Association, Inc. and as such was a party to a collective bargaining agreement covering the period of July 1, 2001 until June 30, 2005 with Local One L affiliated with the Amalgamated Lithographers of America, GCC/IBT ("the Union") covering a unit of workers employed by Scott Printing pursuant to which Scott Printing was obligated to make periodic contributions to the Plan for the purpose of providing retirement benefits to covered workers.

6.      On January 24, 2003, Scott Printing withdrew from the Plan in a complete withdrawal by permanently ceasing all covered operations under the Plan, within the meaning of §§ 4201(a) and 4203(a)(1) or (2) of ERISA, 29 U.S.C. §§ 1381(a) and 1383(a)(1) or (2).

7.      Such a complete cessation of the obligation to make contributions or of all covered operations constituted a "complete withdrawal" from the Plan, for which withdrawal liability may be collected by the Plan, pursuant to § 4201(a) and of ERISA, 29 U.S.C. § 1381(a).

8.      As a result of its complete withdrawal, Scott Printing was obligated to pay withdrawal liability to the Plan of $765,474.00. This liability was determined by the Plan under § 4211(c)(4)(A) of ERISA, 29 U.S.C. § 1391(c)(4)(A). Pursuant to § 4219(c)(1)(C)(i) and (3) of ERISA, 29 U.S.C. § 1399(c)(1)(C)(i) and (3), and the terms of the Plan, Scott Printing was required to make quarterly payments to the Plan in the amount of $30,099.25 commencing on or before March 10, 2005 with a final payment of $3,671.75 due on June 10, 2013.

9.      In accordance with § 4219(b) of ERISA, 29 U.S.C. § 1399(b), on January 3, 2005 the Plan sent a demand for withdrawal liability to Scott Printing. This liability was required to be paid in consecutive quarterly installments of $30,099.25 each commencing March 10, 2005, as provided in § 4219(c)(3) of ERISA, 29 U.S.C. § 1399(c)(3). The letter advised Scott Printing

that if it failed to make the first quarterly payment within sixty (60) days of the date of the letter, the entire amount of withdrawal liability, plus interest, liquidated damages, and the cost of collection, would become due.  The letter further advised Scott Printing to disclose whether it was a member of a group of trades or businesses under common control within the meaning of § 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1)  and §§ 414 and 1563 of the Internal Revenue Code, 26 U.S.C. §§ 414 and 1563  A true and correct copy of the letter is attached as Exhibit "A" and incorporated herein by this reference.

10.    Thereafter, Scott Printing failed to make the first quarterly payment within sixty (60) days of the date of Exhibit A, failed to make any other payments creditable towards its withdrawal liability, and failed to otherwise cure its delinquency.

11.    Pursuant to § 4219(c)(5) of ERISA, 29 U.S.C. § 1399(c)(5), and § 8.03 of the Plan Document, a true and correct copy of which is attached hereto as Exhibit "B" and incorporated herein by this reference, the failure of Scott Printing to make the first quarterly payment within sixty (60) days of the date of Exhibit A and the failure to cure such delinquency constituted a default.

12.    The amount of withdrawal liability payable to the Plan is now $765,474.00  plus interest from March 10, 2005.

13.    On April 28, 2003, an involuntary petition for relief under Chapter 7 of the United States Bankruptcy Code was filed against Scott Printing in the United States Bankruptcy Court. In re Scott Printing Corporation, Bankr. N.J.,  No.03-24227-RG (April 28, 2003).  On or about February 2, 2007, the Judge in the bankruptcy case issued a final decree, declaring the Chapter 7 Bankruptcy case closed. In re Scott Printing Corporation, Bankr. N.J., No. 03-24227-RG (Feb. 2,

2007).  According to a Report for Bankruptcy Judges in Cases to Be Closed dated January 21, 2007, the entire assets of the bankruptcy estate went to (i)Valley National Bank ($308,500), (ii)the Trustee ($16,986), (iii) attorneys fees ($182,552), (iv) accountants ($10,249) and (v) expenses awarded to the  professionals ($25,894).  In re Scott Printing Corporation, Bankr. N.J., No. 03-24227-RG (Jan. 21, 2007).  At no time did the Plan receive any distribution from the Scott Printing bankruptcy estate in satisfaction of its withdrawal liability claim or for any other reason.

14.     On May 19, 2008, the Plan sent a letter to Unz, informing it that a routine review of delinquent employers had raised questions about Unz's membership in a controlled group with Scott Printing. The letter requested Unz disclose evidence of ownership of shares of Unz for the three years prior to December 31, 2003, in order to complete the Plan's review. A true and correct copy of the letter is attached as exhibit "C" and incorporated herein by this reference. Unz did not respond to the Plan's request.

15.     Upon information and belief, at the time of Scott Printing's withdrawal from the Plan, Daniel Scott and Walter Scott were officers and together owned either directly or indirectly more than 80% of Unz.

16.     Upon information and belief, at the time of Scott Printing's withdrawal from the Plan, Daniel Scott and Walter Scott were officers and together owned either directly or indirectly more than 80% of Scott Printing.

17.     By virtue of Daniel Scott's and Walter Scott's controlling interest in both Unz and Scott Printing, the companies were members of a "brother-sister" controlled group as defined in the Treasury Department Regulations, 13.26 C.F.R. § 1.414(c)-2(c)1.

18.    Pursuant to § 4001(b)(1) of ERISA, 29 U.S.C. § 1301(b)(1), Unz and Scott Printing are a "single employer" and Unz is jointly and severally liable for the entire withdrawal liability amount, plus accrued interest, together with liquidated damages and costs of collection.

19.    The Plan qualifies to commence this action under § 502(d)(1) of ERISA, 29 U.S.C. 1132(d)(1), and further brings this action on behalf of plan participants and beneficiaries pursuant to §§ 502(a)(3)(B)(ii) and 4301(a)(1) of ERISA, 29 U.S.C. §§ 1132(a)(3)(B)(ii) and 1451(a)(1).

20.    The Plan Document provides in Section 8.03, in pertinent part, as follows:

> Nonpayment of any Contributions by an Employer when due shall not relieve any other Employer of its obligations to make payments. In addition to the other remedies to which the parties may be entitled, an Employer in default for ten (10) working days may be required at the discretion of the Trustees to pay such fees, costs and interests as are provided for by the Collective Bargaining Agreement between the Union and the Employer, or if greater, all costs of litigation, attorney's fees, interest at the prime interest rate and liquidated damages of twenty percent (20%) of the delinquency.

21.    In accordance with the Plan Document and the Plan Trustees' binding interpretations thereunder, and pursuant to § 502(g)(2) and 4301(b) of ERISA, 29 U.S.C. § 1132(g)(2) and 1451(b), Unz is obligated to pay interest and liquidated damages on the delinquent withdrawal liability payments, and to pay the Plan's attorneys fees and costs.

## SECOND CAUSE OF ACTION

22.    Plaintiff repeats and realleges each allegation of paragraphs 1 through 21.

23.    Scott Printing has a history of utilizing Unz as a vehicle for evading and avoiding its pension and labor obligations under its contract with the Union.

-6-

24.    In February 1995, Scott Printing acquired electronic prepress equipment. Scott Printing held out to both the public and its own employees that the electronic prepress assignments would be carried out by Scott Printing and Scott Printing employees. Scott Printing housed the electronic prepress equipment and operation in the same Scott Printing facility as the conventional prepress equipment which was operated by employees who participated in the Plan. Scott Printing placed classified adds in local newspapers for new hires for the electronic prepress equipment, stating that employees would work for Scott Printing. Scott Printing included photographs of electronic prepress workers in its sales brochures, suggesting that they worked for Scott Printing.  Scott Printing directed its electronic prepress employees to use the same time clock, cafeteria, and parking lot as conventional prepress employees, and Scott Printing required its electronic and conventional prepress workers to collaborate on a daily basis.

25.    Scott Printing placed the Scott Printing electronic prepress employees on Unz's payroll. The purpose of the assignment of these employees to the Unz payroll was to avoid Scott Printing's obligations under the collective bargaining agreement, including making required contributions to the Plan, and to evade and avoid its liabilities in the case of withdrawal.

26.    As a result of the assignment of electronic prepress operations to Unz employees, the Plan was adversely affected to the extent required contributions to the Plan were not made.

27.    At all times, Daniel and Walter Scott, as principals and owners of Unz, were aware of and orchestrated the efforts to shift the electronic prepress work from Scott Printing employees to Unz employees.

28.     At all times, Daniel and Walter Scott, as principals and owners of Unz, were aware that Scott Printing's failure to make required contributions to the Plan resulted in considerable unfunded liability to the Plan.

29.     A principle purpose of maintaining Unz as a separate corporate entity was to evade and avoid obligations by Scott Printing to the Plan, including the payment of withdrawal liability to the plan.  Under § 4212(c) of ERISA, 29 U.S.C. § 1392(c), the Plan is entitled to determine and collect its withdrawal liability without regard to any transaction which purports to establish that Unz as a separate corporation from Scott Printing.

## RELIEF

WHEREFORE, the Plan respectfully requests the following relief:

(a)     Judgment in its favor in the sum of $765,474.00.

(b)     Interest on the amount owed the Plan by Unz in accordance with § 502(g)(2)(B) of ERISA, 29 U.S.C. § 1132(g)(2)(B).

(c)     Liquidated damages computed as provided in § 502(g)(2)(C) of ERISA, 29 U.S.C. § 1132(g)(2)(C).

(d)     Attorneys fees and costs in accordance with § 502(g)(2)(D) of ERISA, 29 U.S.C. § 1132(g)(2)(D); and

(e)     Such other and further relief as the Court may deem just and proper in accordance with § 502(g)(2)(E) of ERISA, 29 U.S.C. § 1132(g)(2)(E).

Dated: August 6, 2008                                    Respectfully submitted,

                                                KENNEDY, JENNIK & MURRAY, P.C.
                                                Attorneys for Plaintiff

                                                By: Thomas Kennedy, Esq.
                                                113 University Place
                                                New York, NY 10003
                                                (212) 358-1500

# EXHIBIT



KENNEDY, SCHWARTZ & CURE, P.C.

ATTORNEYS AT LAW

113 UNIVERSITY PLACE

NEW YORK, NEW YORK 10003

(212) 358-1500

* * *

FACSIMILE (212) 358-0207

E-MAIL: laborlawyers@ksclaborlawyers.com

THOMAS M. KENNEDY
ARTHUR Z. SCHWARTZ (PA)
IRA CURE (NJ)
SUSAN M. JENNIK
THOMAS M. MURRAY

OF COUNSEL:
LARRY MAGARIK

STUART LICHTEN
ELIZABETH M. PILECKI (NJ, MA)
KENNETH N. PAGE (D.C. Only)
EDWARD PICHARDO (WI)
DENNIS TORREGGIANI (NJ)
DANIEL R. BRIGHT
ERICH L. HAHN
JENNIFER A. HOGAN (CT)

January 3, 2005

**VIA CERTIFIED, RRR**
**7001 0360 0001 1554 1204**
**AND REGULAR MAIL**

Scott Printing Corp.
55 Broad Street
New York, New York 10006

Re:    Demand for Payment of Withdrawal Liability

Gentlepeople:

We represent the ALA Lithographic Industry Pension Plan (the "Plan"). Scott Printing Corp. (the "Company") ceased its contributions and effected a complete withdrawal from the Plan effective January 24, 2003. On behalf of the Plan, we hereby demand payment of withdrawal liability, pursuant to § 4201 (et. seq. of the Employer Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §1381 et seq.

Based on the method described in ERISA §4211(b), 29 U.S.C. §1391(b), the amount of the Company's withdrawal liability has been determined to be $765,474.00, as shown by the enclosed analysis. The Company is required to make 33 quarterly payments to the Plan of $30,099.25 each, plus one final payment of $3,671.75. ERISA § 4219(c)(4), 29 U.S.C. §1399(c)(4), authorizes the Company to prepay the outstanding amount, plus accrued interest, in whole or in part, at any time without penalty.

Pursuant to Section 4219(a) of ERISA, please advise the undersigned, within 30 days, whether Scott Printing Corp. is or has been since December 31, 1974 a member of a group of trades or businesses under common control ("control group") within the meaning of ERISA Section 4001(b)(1) and Sections 414 and 1563 of the Internal Revenue Code. If Scott Printing Corp. is or was a member of a controlled group, please provide the individual or business names and addresses of each entity within the controlled group.

The Company has the right, within 90 days after receipt of this demand to:

KENNEDY, SCHWARTZ & CURE, P.C.
ATTORNEYS AT LAW

January 3, 2005
Page 2

    (1)    ask the Plan to review any specific matter relating to the determination of the withdrawal liability and the schedule of payments;

    (2)    identify any inaccuracy in the determination of the amount of the unfunded benefits allowable to the Company; and

    (3)    furnish the Plan with any additional relevant information.

    Notwithstanding the Company's right to review or appeal, the Company is required by ERISA §4219(c)(2), 29 U.S.C. §1399(c)(2), to pay the first installment not later than $30,099.25 is due to the Plan on or before March 10, 2005.

    Failure to make any payment when due shall constitute default and shall entitle the Plan to demand immediate payment of the full amount of withdrawal liability, plus interest, liquidated damages equal to 20 percent of the amount due, and the cost of collection.

    Pursuant to ERISA §4221(a)(1), 29 U.S.C. §1401(a)(1), any dispute between the Company and the Plan concerning the determination of withdrawal liability shall be resolved through arbitration.

                   Very truly yours,

                   Ira Cure

IC/jwm

cc:    Patrick LoPresti
       Anthony Caifano
       Gene Kreis
       Howard Savlick
       Nicholas Lacetti



# ✱ SEGAL

**THE SEGAL COMPANY**
One Park Avenue  New York, NY 10016-5895
T 212.251.5000  F 212.251.5490  www.segalco.com

## MEMORANDUM

| | |
|---|---|
| **FROM:**  Nicholas Laccetti<br>Aldwin Frias | **DATE:**  November 18, 2003 |
| **TO:**  Howard Savlick | |
| **RE:**  **ALA – Lithographic Industry Pension Plan – Withdrawal Liability for Scott Printing, Inc.** | |

As requested, we have completed a withdrawal liability calculation for Scott Printing, Inc. Our calculation is based on information received from your office with respect to Scott's contributions history (1993 – 2002) and its actual withdrawal date of January 24, 2003. We have attached the withdrawal liability calculation and the payment schedule.

Since the withdrawal date is in 2003, Scott's withdrawal liability must be determined based on the January 1, 2003 actuarial valuation. Please note that our calculation is based on the data, results and assumptions (including the investment return assumption of 8.0%) of the January 1, 2003 actuarial valuation report. The assumptions and methodology used to determine this withdrawal liability and payment schedule is based on our understanding of the rules previously adopted by the Trustees and applied by the Fund.

On this basis, the unfunded present value of vested benefits for withdrawal liability purposes as of December 31, 2002 is $17,758,964, resulting in a withdrawal liability for Scott Printing of $765,474.

Please let us know if you have any questions.

cc:   Pat LoPresti
      Thomas Kennedy, Esq.
      Jerome Kauff, Esq.

Benefits, Compensation and HR Consulting  ATLANTA  BOSTON  CHICAGO  CLEVELAND  DENVER  HARTFORD  HOUSTON  LOS ANGELES  MINNEAPOLIS
NEW ORLEANS  NEW YORK  PHILADELPHIA  PHOENIX  SAN FRANCISCO  SEATTLE  TORONTO  WASHINGTON, DC

Multinational Group of Actuaries and Consultants  AMSTERDAM  BARCELONA  GENEVA  HAMBURG  JOHANNESBURG  LONDON  MELBOURNE
MEXICO CITY  OSLO  PARIS



Page 2

## I.   Withdrawal Liability Calculation for Scott Printing, Inc.

Date of Withdrawal: January 24, 2003

1.   December 31, 2002 unfunded present value of vested benefits for withdrawal liability purposes...........................$17,758,964

2.   Total contributions of Scott Printing, Inc. for the five years ended December 31, 2002.....................................................436,307

3.   Total Plan contributions of all employers for the five years ended December 31, 2002..................................................10,122,301

4.   Total estimated withdrawal liability: (1) * (2) / (3) ...................765,474

5.   De minimis deductible ...............................................................0

6.   Net estimated withdrawal liability: (4) – (5).............................765,474

Note: All contributions are based on information supplied by the Fund Office.

Page 3

II.    **Determining Payment and Length of Payment Period for Scott Printing, Inc.**

1.    Total contributions for years ended December 31:

| | | | |
|------|----------|------|---------|
| 1993 | $80,960  | 1998 | 136,788 |
| 1994 | 77,569   | 1999 | 100,180 |
| 1995 | 126,397  | 2000 | 78,777  |
| 1996 | 105,106  | 2001 | 65,242  |
| 1997 | 119,298  | 2002 | 55,320  |

2.    Required annual payment, highest 3-year average contributions .........$120,397

3.    Withdrawal liability ...........................................................................765,474

4.    Plan funding investment return assumption........................................ 8.00%

5.    Amount of quarterly payments (2) ÷ 4 quarters................................... 30,099.25

6.    Number of full payments ....................................................................33

7.    Final payment.....................................................................................3,671.75

Payment Schedule:

$30,099.25 per quarter for 33 quarters plus a final payment of $3,671.75

Note: All contributions are based on information supplied by the Fund Office.

579694/01550.001

# EXHIBIT

# B

# ALA-LITHOGRAPHIC INDUSTRY PENSION PLAN

## THE PLAN

Effective May 1, 1973 as Amended Through ~~December 31, 1994~~ October 4, 2001

This Pension Plan is established pursuant to collective bargaining agreements between Local One of the Amalgamated Lithographers of America and Contributing Employers to provide pensions and related benefits for employees represented by such Local One who are or will be employed by the employers contributing to the Plan. Responsibility for the general administration of the Plan is placed in Trustees appointed by Local One and Contributing Employers. All contributions are paid to the Trustees to be held in trust, invested and disbursed for the exclusive benefit of Participants and Pensioners of this Plan.

## ARTICLE I

### Name of the Plan

**Section 1.01**    This Pension Plan shall be known as the ALA-Lithographic Industry Pension Plan (hereinafter referred to as the "Pension Plan" or the "Plan").

## ARTICLE II

### Definitions

**Section 2.01**    For the purposes of this Plan, the following words and phrases shall have the following meanings:

1.    "ALA" means Amalgamated Lithographers of America.

2.    "Union" means Local One of the Amalgamated Lithographers of America.

3.    "Employee" means a person who is covered by an agreement between the Union and any Contributing Employer.

4.    "Pension Plan" or "Plan" means this ALA-Lithographic Industry Pension Plan.

5.    "Participant" means one who has fulfilled the minimum requirements for participation in this Plan.

6.    "Contributing Employer" means any employer having an agreement with the Union by the terms of which such employer agrees to make Contributions to this Pension Plan, which Contributions the Trustees have agreed to accept.

7.    "Employer Contributions" or "Contributions" means the amounts paid to the Plan by Contributing Employers pursuant to their respective agreements with the Union.

8.    "Agreement and Declaration of Trust" means the instrument entered into by and between the Union and the Metropolitan Lithographers Association, duly establishing this Plan.

9.    "Trustees" means the Trustees provided for in Agreement and Declaration of Trust who are responsible for the administration of this Plan.

10.    "Pensioner" means one who is retired under the Plan.

11.    "Beneficiary" means the person or organization designated by a Participant or Pensioner or otherwise entitled to receive the Death Benefit payable hereunder upon his death.

12.    "Fiscal year" means the calendar year.

13.    "Corporate Trustee" means the organization, if any, that holds or invests such Assets of the Plan as the Trustees may from time to time turn over to such organization for such purposes or which recommends the investment of such Assets.

14.    "Assets" means cash, securities, property and all other funds belonging to the Plan.

15.    "Collective Bargaining Agreement" or "Agreement" means any agreement between the Union and any Contributing Employer or Employers, together with any modification or amendment thereof, by the terms of which such Employer or Employers agree to make Contributions to the Plan, which Contributions the Trustees have agreed to accept. Wherever the term "Collective Bargaining Agreement" or the term "Agreement" appears, it shall be taken to include the other.

16.    "Hour of Service" means:

(a)    Each hour for which an employee is directly or indirectly paid by the employer but not in excess of 501 hours in any continuous period during which the employee performs no service. An hour of service shall also include each hour for which back pay, irrespective of mitigation damages, has either been awarded or agreed to by the employer. These hours shall be credited to the employee for the computation period or periods to which the award or agreement pertains. Hours of service shall be calculated in accordance with 29 CFR § 2530.200b-2. (The text of § 2530.200b-2 can be found in the appendix.)

(b)    Each hour during absence from work (1) by reason of pregnancy of the employee; (2) by reason of the birth of a child of the employee; (3) by reason of the placement of a child in connection with the adoption of the child by the employee; or (4) for purposes of caring for the child during the period immediately following the birth or placement for adoption. Such employee shall be treated as having completed the number of hours that normally would have been credited but for the absence, up to but not in excess of 501 hours for any period. Hours of Service under this subdivision (b) shall be credited in the year following the year in which the absence began, but shall nevertheless be credited in the year the absence began to the extent necessary to prevent a Break in Service in that year.

3

17.    "Vested Pension Benefit" means the non-forfeitable Pension Benefit accrued under the terms of this Plan. A participant shall have a Vested Pension Benefit on:

(a)    The date on which he has acquired 5 years of Service Credit, or if earlier

(b)    The later of the Participant's 65th birthday or the fifth anniversary of the commencement of his participation in the Plan.

18.    "Covered Employment" means an Employee's employment under a Collective Bargaining Agreement which requires the Employer to make contributions to the Plan.

19.    "Owner-Employees." The Plan does not cover any owner-employees as defined by Section 401(c)(3) of the Code. For Plan years commencing after December 31, 1996, if contributions or benefits are provided for any such owner-employees under the Plan, such contributions on behalf of any owner-employee may be made only with respect to the earned income of such owner-employee which is derived from the trade or business with respect to which the Plan is established.

Section 2.02    Where appropriate, the words used in this instrument in the singular shall include the plural; the masculine, the feminine.


## ARTICLE III

### Participation

Section 3.01    An employee shall become a Participant in the Plan as of the first day of the month following the earlier of the month:

(a)    during which the total of all Employer Contributions made on his behalf shall be not less than $250.00, provided that some part of such Contributions shall have been made

during each of the twelve (12) or more calendar months during a period of not more than twenty-four (24) consecutive months, or

(b)    during which he shall have completed 1,000 Hours of Service within any period of 12 consecutive months. The initial computation period shall begin with the performance of the first Hour of Service.

A Participant who is credited with 1,000 Hours of Service in both the initial eligibility computation period and the fiscal year which includes the first anniversary of the Participant's employment commencement date shall be credited with two years of service for purposes of eligibility to participate.

Section 3.02    All officers and employees of the Union or any related organization shall be eligible to become participants in this Plan provided Employer Contributions, as herein defined, are made to the Plan for such officers and employees at the same rate as those made by other Contributing Employers. For this purpose and for no other purpose, the said Union or related organization shall be treated as a Contributing Employer.

Section 3.03    A Participant shall cease to be a Participant only as follows:

(a)    If he has not acquired a Vested Pension Benefit, he ceases to be a participant at the end of any Fiscal Year during which he does not complete at least 250 Hours of Service. A Participant who leaves covered employment, but remains employed by the same Contributing Employer without any intervening quit, discharge or retirement, shall not cease to be a participant by reason of this Section.

(i)    The cessation of Participation will be temporary if the number of consecutive years during which the former Participant fails to complete at least 250

5

Hours of Service does not equal at least five or, if greater, the number of years of Service Credit acquired by him. Upon again becoming a Participant pursuant to Section 3.01, all Service Credit acquired prior to a temporary cessation of Participation will be restored.

(ii)    The cessation of Participation will be permanent if the number of consecutive years during which the former Participant fails to complete at least 250 Hours of Service equals or exceeds five years or, if greater, the number of years of Service Credit acquired by him.

(b)    If he dies prior to Retirement.

Section 3.04    One who permanently ceases to be a Participant but who again becomes a Participant, shall be considered a new Participant for all purposes of this Plan and shall not again be given Past Service Credit nor Future Service Credit accumulated prior to his latest period of continuous participation; nor will any Contributions made on his behalf prior to said period be included in the calculation of any Benefit hereunder.

Section 3.05    Participation in this Plan and all the rights, benefits and privileges of participation by any Participant or Pensioner or any of his Beneficiaries shall be determined in accordance with and be subject to the provisions hereof, including, for Plan years commencing after December 31, 1996, Section 414(n)(2)(C) as amended.

## ARTICLE IV

### Service Credit

**Section 4.01  Past Service Credit.**  Past Service Credit shall be given to a Participant who becomes a Participant prior to May 1, 1978, for each month of his full-time employment by an Employer in contractual relations with the Union during the period from May 1, 1948 through April 30, 1973, computed to the nearest whole month. The total of the months so credited shall be divided by twelve (12) to obtain years of past service. "Full time employment" shall be determined by the Trustees by rules uniformly applicable to all persons similarly situated.  Such rules shall not require employment in excess of 20 hours per week.

**Section 4.02  Future Service Credit.**  Future Service Credit shall be given to a Participant at the rate of 1/12 year for each calendar month during which Employer Contributions are made on his behalf. In any event, however, any Participant who completes 1,000 Hours of Service during any Fiscal Year will be given Future Service Credit for that entire Fiscal Year.

**Section 4.03**    Notwithstanding anything contained herein to the contrary, no more than one year of Service Credit (Past Service Credit and/or Future Service Credit) shall be allowed for each 12 months of elapsed time.

**Section 4.04**    For purposes of participation and vesting for Normal Pension Benefit only, a Participant employed by a Contributing Employer shall be credited in the manner herein specified for any period of non-covered employment, provided there was no quit, discharge or retirement between his covered and non-covered employment with the same Contributing Employer.

7

**Section 4.05  USSERA Military Service.**

    (a)    An individual reemployed under 38 United States Code chapter 43 shall be treated with respect to the Plan as not having incurred a break in service with the Employer by reason of such individual's period of qualified military service.

    (b)    Each period of qualified military service served by an individual is, upon reemployment under such chapter, deemed with respect to the Plan to constitute service with the Employer for the purpose of determining the nonforfeitability of the individual's accrued benefits under such plan and for the purpose of determining the accrual of benefits under such plan.

    (c)    An individual reemployed under such chapter is entitled to accrued benefits that are contingent on the making of, or derived from, employee contributions or elective deferrals only to the extent the individual makes payment to the Plan with respect to such contributions or deferrals. No such payment may exceed the amount the individual employer would have been permitted or required to contribute had the individual remained continuously employed by the employer throughout the period of qualified military service. Any payment to such plan shall be made during the period beginning with the date of reemployment and whose duration is 3 times the period of the qualified military service (but not greater than 5 years).

    (d)    Any references to chapter 43 of title 38, United States Code, shall be treated as a reference to such chapter as in effect on December 12, 1994 (without regard to any subsequent amendment).

8

**ARTICLE V**

**Benefits**

**Section 5.01  Normal Pension Benefit.**

1.      A Participant who has reached his 65th birthday shall be eligible for a Normal Pension Benefit on the following date:

(a)      the date on which he has acquired at least five (5) years of Service Credit or, if earlier

(b)      the date of the fifth anniversary of the commencement of his participation in the Plan.

A Participant with Service Credit after January 1, 1988 who commenced his participation after his 60th birthday, shall be eligible for a Normal Pension Benefit when he reaches the fifth anniversary of that commencement.

2.      The monthly amount of Normal Pension Benefit for Participants shall be equal to the sum of:

(a)      A Future Service Pension equal to 1.4%, and for participants retiring on or after July 1, 1998 1.47%, and for participants retiring on or after January 1, 2000 1.54% of the total of all monies contributed to this Plan on the Participant's behalf,

- plus -

(b)      A Past Service Pension equal to 1%, and for participants retiring on or after July 1, 1998 1.05%, and for participants retiring on or after January 1, 2000 1.10% of the lower of the following:

1.      The average monthly contribution made on the Participant's behalf

9

prior to January 1, 1 983; and

2.     The average monthly contribution made on the Participant's behalf; multiplied by the number of months of Past Service Credit, as defined in Article IV, hereof.

3.     The average monthly contribution, as used in subsection 2 of this Section 5.01 will be determined by dividing the total of all Employer Contributions made on the Participant's behalf by the number of months between the date on which an Employer first became obligated to make Contributions on his behalf or May 1, 1976, whichever occurs earlier, and January 1, 1983, or the date of the Participant's first Pension payment, whichever is applicable pursuant to the provisions of paragraph 2(b) of this Section 5.01, provided that, in the case of a participant on whose behalf an Employer first became obligated to make Contributions as of a date later than May 1, 1973, such average shall, in no event, exceed five percent (5%) of the maximum day scale for the Participant's classification on May 1, 1973. The Trustees may, by Rules uniformly applicable to all persons similarly situated, make allowance for any month or months for which no Employer Contribution is made due to circumstances beyond the control of the Participant and/or a final, continuous period of unemployment after age 65, during which a Participant who is eligible for Pension Benefits voluntarily defers his first pension payment.

4.     Anything herein to the contrary notwithstanding, if a Participant continues in covered employment after the date on which he becomes eligible for a Normal Pension Benefit, the monthly amount of his Normal Pension Benefit will not be lower than it would have been if he retired on the first date on which he became eligible for such Normal Pension Benefit.

10

**5.02 Unreduced Early Pension Benefit.**

1.     A Participant who has reached his 62nd birthday shall be eligible for an Early Pension Benefit unreduced by any actuarial factor related to age, provided the number of months during which Employer Contributions are made on his behalf when added to the number of months of Past Service Credit equal at least 300.

2.     The monthly amount of Unreduced Early Pension Benefit for Participants who initially retire on or after January 1, 1983 shall be equal to the sum of:

a)     A Future Service Pension equal to 1.4%, and for participants retiring on or after July 1, 1998 1.47%, and for participants retiring on or after January 1, 2000 1.54% of the total of all monies contributed to this Plan on the Participant's behalf,

**- plus -**

(b)     A Past Service Pension equal to 1%, and for participants retiring on or after July 1, 1998 1.05%, and for participants retiring on or after January 1, 2000 1.10% of the lower of the following:

.1.     The average monthly contribution made on the Participant's behalf prior to January 1, 1983; and

2.     The average monthly contribution made on the Participant's behalf, multiplied by the number of months of Past Credit as defined in Article IV, hereof.

3.     The average monthly contribution, as used in subsection 2 of this Section 5.02, will be determined by dividing the total of all Employer Contributions made on the Participant's behalf by the number of months between the date on which an Employer first becomes obligated to make Contributions on his behalf or May 1, 1976, whichever occurs earlier, and January 1, 1983, or the

11

last day of the month in which the Participant's 65th birthday falls, whichever is applicable pursuant to the provisions of paragraph 2(b) of this Section 5.02, provided that, in the case of a Participant on whose behalf an Employer first became obligated to make Contributions as of a date later than May 1, 1973, such average shall, in no event, exceed five percent (5%) of the maximum day scale for the Participant's classification on May 1, 1973. The Trustees may, by rules uniformly applicable to all persons similarly situated, make allowances for any month or months for which no Employer Contribution is made due to circumstances beyond the control of the Participant and/or a final continuous period of unemployment after age 62 during which a Participant who is eligible for Pension Benefits voluntarily defers his first Pension payment and/or, in the case of a participant on whose behalf Employer Contributions were made after his 60th birthday, any or all months after age 62.

### Section 5.03  Reduced Early Pension Benefit.

1.     A Participant who has reached his 55th birthday shall be eligible for an Early Pension Benefit provided the number of months during which Employer Contributions are made on his behalf when added to the number of months of Past Service Credit equals at least 120.  This Section shall be applicable to those Participants who are entitled to a Vested Pension Benefit as defined in Section 2.01 (1 7) hereof.

2.     The monthly amount of Reduced Early Pension Benefit shall be equal to the Normal Pension Benefit or the Unreduced Early Pension Benefit computed as above, reduced, as determined by the Trustees, for each month by which the Participant is less than age 65 or age 62, whichever is applicable, at the date of Early Retirement. Benefits under this Section shall be calculated in accordance with the table found at the end of this Plan document.

**Section 5.04  Special Reduced Early Pension Benefit.**

1.      A participant who has reached his 55th birthday shall be eligible for a Special Reduced Early Pension Benefit provided the number of months during which Employer Contributions are made on his behalf when added to the number of months of Past Service Credit equal at least 300.

2.      The monthly amount of Special Reduced Early Pension Benefit shall be equal to the sum of (a) and (b) below, reduced, as determined by the Trustees, for each month by which the Participant is less than age 62 at the date of Retirement.

a)      A Future Service Pension equal to 1.4%, and for participants retiring on or after July 1, 1998 1.47%, and for participants retiring on or after January 1, 2000 1.54% of the total of all monies contributed to this Plan on the Participant's behalf,

**- plus -**

(b)     A Past Service Pension equal to 1%, and for participants retiring on or after July 1, 1998 1.05%, and for participants retiring on or after January 1, 2000 1.10% of the lower of the following:

1.      The average monthly contribution made on the Participant's behalf prior to January 1, 1983; and

2.      The average monthly contribution made on the Participant's behalf multiplied by the number of months of Past Service Credit as defined in Article IV, hereof.

3.      The average monthly contribution as used in subsection 2 of this Section 5.04 will be determined by dividing the total of all Employer Contributions made on the Participant's behalf

13

by the number of months between the date on which an Employer first becomes obligated to make Contributions on his behalf of May 1, 1976, whichever occurs earlier, and the last day of the month in which the Participant's 65th birthday falls, provided that, in the case of a Participant on whose behalf an Employer first became obligated to make Contributions as of a date later than May 1, 1973, such average shall, in no event, exceed five percent (5%) of the maximum day scale for the Participant's classification on May 1, 1973. The Trustees may, by rules uniformly applicable to all persons similarly situated, make allowances for any month or months for which no Employer Contribution is made due to circumstances beyond the control of the Participant and/or a final continuous period of unemployment after age 62 during which a Participant who is eligible for Pension Benefits voluntarily defers his first Pension payment and/or, in the case of a Participant on whose behalf Employer Contributions were made after his 53rd birthday, any or all months after age 55.

### Section 5.05  Special Minimum Pension Benefit

1.      A Participant who has worked at least 1,000 hours in Covered Employment after his 62nd birthday shall be eligible for a Special Minimum Pension Benefit commencing on his retirement on or after his 65th birthday, notwithstanding the fact that he is not eligible for a Normal Pension Benefit.

2.      The monthly amount of Special Minimum Pension Benefit shall be equal to to 1.4%, and for participants retiring on or after July 1, 1998 1.47%, and for participants retiring on or after January 1, 2000 1.54% of all monies contributed to this Plan on the Participant's behalf during his latest period of continuous Participation.

14

**Section 5.06  Disability Award Pension Benefit**

1.      A Participant who has been awarded a Social Security Disability Pension shall be eligible for a Disability Award Pension Benefit from this Plan, provided the number of months during which Employer Contributions are made on his behalf when added to the number of months of Past Service Credit equal at least 120.

2.      The monthly amount of Disability Award Pension Benefit, commencing at any age, shall be equal to the Normal Pension Benefit earned to the date of retirement, without reduction for age. Such Normal Pension Benefit shall be computed as set forth above, except that, if no contributions were made during any one or more of the five (5) months immediately prior to the date of his first pension payment, such month or months shall not be counted in determining the average monthly contribution.

3.      Disability Award Pension Benefits will be paid as of the date of entitlement to a Social Security Disability Pension.

4.      If the Social Security Disability Pension is terminated at any time prior to age 65, the Disability Award Pension Benefit shall also be terminated and the Pensioner shall again become a Participant for all purposes of this Plan.

5.      Any Participant entitled to receive Disability Award Pension Benefits prior to age 55 shall, upon reaching age 55, receive, instead of such Benefits, payment of the Pension Benefit as provided in Option 3, set forth below, unless the Pensioner, with the consent of the spouse, if any, notifies the Trustees in writing any time prior to the 55th birthday of the Pensioner that he rejects the benefits provided by such Option 3. If such Pensioner dies before age 55, leaving a survivor annuitant as described below, he shall be deemed to have elected Option 3, set forth below, unless

15

he had, with the consent of the spouse, notified the Trustees in writing that he rejects the benefits provided by such Option 3.

6.     Any married Participant who becomes entitled to receive Disability Award Pension Benefits at age 55 or later shall receive, instead of such Benefits, payment of the Pension Benefit as provided in Option 3 set forth below, unless the Participant, with the consent of the spouse, notifies the Trustees in writing any time prior to the first month for which a Pension Benefit is payable that he elects not to take Option 3.

### Section 5.07  Death Benefits.

1.     Death Benefit Before Retirement.

Subject to the provisions of Article VI hereof, the Beneficiary, if any, of a Participant who dies before actual retirement under this Plan, shall be entitled to a Death Benefit equal to one hundred percent (100%) of the total of all Contributions made on behalf of the deceased by all Contributing Employers.

2.     Death Benefit After Retirement.

Subject to the provisions of Article VI hereof, the Beneficiary, if any, of a deceased Pensioner who did not elect a Joint and Survivor Option pursuant to Section 5.08 hereof, may be entitled to a Death Benefit equal to one hundred percent (100%) of the total of all Contributions made on behalf of the deceased by all Contributing Employers minus one percent (1 %) of such total for each monthly Pension Benefit paid prior to the death of the deceased Pensioner.

3.     The Trustees shall determine, by rules uniformly applicable to all Beneficiaries similarly situated, whether to pay the Death Benefit in a lump sum or in monthly installments over a period of not more than fifty (50) months.

**Section 5.08  Joint and Survivor Option Pension Benefit.**

1.    Subject to the conditions hereafter stated, a Participant who is eligible for a Normal or Early Pension Benefit may, in lieu of all Benefits otherwise payable, elect a Joint and Survivor Option by filing a written request with the Trustees at any time prior to his actual retirement. Except as might otherwise be provided by a qualified domestic relations order made pursuant to a state domestic relations law, a Survivor Annuitant may only be a person who was the spouse of the Participant (1) at the Participant's annuity starting date, or (2) at the date of the Participant's death if he was then eligible for a Normal Pension Benefit or Early Pension Benefit, provided, however, that if the Participant dies after the annuity starting date, the spouse to whom the Participant was married during the one-year period ending on the annuity starting date shall be the Survivor Annuitant even though not married to the Participant at the time of his death. Each such request shall be made on a form prescribed and furnished by the Trustees, shall specify the Option elected, shall name the spouse, shall contain satisfactory proof of age of the named spouse, and shall be duly signed by the Participant.  The election of the Option shall be made to take effect with the first monthly Pension payment. The amount of the Pension Benefit payable under the Joint and Survivor Option shall be the equivalent value of the Pension Benefit based on factors set forth in the actuarial tables in the attached appendices to which the Participant would otherwise be entitled, as determined by the Trustees. Each periodic payment to the Survivor Annuitant hereunder shall be no greater than each payment to the Participant during his lifetime.  A Participant shall be notified in writing of the effect of choosing or not choosing the options set forth in this Section 5.08.

2.    Subject to the conditions herein set forth, a married Participant who retires upon qualifying for Normal Pension Benefit, Early Pension Benefit or Disability Pension Benefit shall

receive payment of the Pension Benefit as provided in Option 3 set forth below, unless the Participant with consent of the spouse notifies the Trustees in writing any time prior to the first month for which a pension benefit is payable that he elects not to take Option 3.

3.    Anything herein to the contrary notwithstanding, a marked Participant who dies after becoming Vested and before beginning to receive such benefits shall be deemed to have elected Option 3, unless with the consent of the spouse he shall have given notice to the Trustees in writing to the effect that he rejects the benefits provided by such Option 3.

4.    In the event the Participant effectively elects or is deemed to have elected a Joint and Survivor Option, payment of the Pension Benefit will be as follows:

A.    **Option 1.**

A reduced Pension Benefit, payable to the Pensioner during his lifetime and, upon his death, such reduced Pension Benefit payable under this Option 1 to the Pensioner, shall become payable to the Survivor Annuitant.

If the Survivor Annuitant predeceases the Pensioner, the Pensioner will nevertheless continue to receive the reduced Pension Benefit for life and all payments will cease at his death. (See Section 508(1) and the attached appendices.)

B.    **Option 2.**

A reduced Pension Benefit payable to the Pensioner during his lifetime and, upon his death, 66 2/3% of such reduced Pension Benefit payable under this Option 2 to the Pensioner, shall become payable to the Survivor Annuitant.

If the Survivor Annuitant predeceases the Pensioner, his Benefit shall revert to the full amount of Pension to which he would have been entitled in the absence of the election

18

of a Joint and Survivor Option. Such increased Benefit shall become payable for the month following the month in which the death of the Survivor Annuitant occurs and shall continue during the lifetime of the Pensioner, with all payments ceasing at his death. (See attached appendices.)

C.    **Option 3.**

A reduced Pension Benefit payable to the Pensioner during his lifetime and, upon his death, 50 percent (50%) of such reduced Pension Benefit payable under this Option 3 to the Pensioner, shall become payable to the Survivor Annuitant.

If the Survivor Annuitant predeceases the Pensioner, the Pensioner will nevertheless continue to receive the reduced Pension Benefit for life and all payments will cease at his death. (See attached appendices.)

5.    The first Pension Payment to the Pensioner under Option 1 or Option 2 or Option 3 above, shall become payable on the first day of the month following the calendar month in which he retires and shall continue to and include the month in which the death occurs.

6.    If the Participant dies after becoming eligible for Pension Benefits, the first Pension Payment to the Survivor Annuitant under Option 1 or Option 2 or Option 3, above, shall become payable on the first day of the month following the calendar month in which the death of the Pensioner occurs, on or after the Pensioner's retirement date, if the Survivor Annuitant is living on such first day of the month. If the Participant dies prior to retirement but after becoming Vested, the Survivor Annuitant shall begin receiving monthly benefits under Option 3 on the date that the Participant would have first been eligible for a Pension Benefit unless with the consent of the spouse he had notified the Trustees in writing of his election not to take Option 3. Subsequent monthly

19

payments will be made on the first day of each month thereafter throughout the Survivor Annuitant's remaining lifetime and will terminate with the monthly payment due on the first day of the month in which the death of the Survivor Annuitant occurs.

7.    After an election of an Option has been made, such election cannot be modified or rescinded throughout the lifetime of the Participant, except that:

(a)    If the Survivor Annuitant predeceases the Participant, prior to his actual retirement under the Plan, the Option shall not become effective and payment shall be made as otherwise provided in the Plan, as if an Option had never been elected.

(b)    If the Participant who had elected an Option dies prior to actual retirement under the Plan, the Option shall not become effective and the Survivor Annuitant shall not be entitled to any payments under the provisions of this Section 5.08, except as provided in subsection 3 above.

(c)    A Participant may with the consent of the spouse in writing, prior to actual retirement under the Plan but not thereafter, revoke elections to take or not to take Option 3. All such Participants shall be granted the opportunity to elect or change an option during the 90-day period ending on the annuity starting date. With regard to the qualified pre-retirement survivor annuity, the election period for the Participant shall begin on the first day of the Fiscal Year during which the Participant shall attain age 35.

8.    Whenever under this Section consent of the spouse is required, it shall be in writing witnessed by a notary public or a Plan representative and shall designate the beneficiary and/or form of benefits which may not be changed without the consent of the spouse.

9.    The Plan shall provide to each participant, within a reasonable period of time before the annuity starting date (and consistent with such regulations as the Secretary of the Treasury may prescribe), a written explanation in accordance with Section 417(a)(3) of the Code and Section 205(c)(3) of ERISA. Notwithstanding such provision, the Plan may provide the written explanation after the annuity starting date in accordance with Section 417(a)(7) of the Code and Section 205(c)(8) and such regulations as the Secretary of the Treasury may promulgate thereunder, and in such case will permit the participant to elect to waive such requirement in accordance with and subject to Section 417(a)(7)(B) of the Code and Section 205(c)(8)(B) of ERISA.

**Section 5.09** Notwithstanding the foregoing, the annual benefits payable under this Plan and the Employee's Pension Plan of Local One, Amalgamated Lithographers of America and Related Organizations to any Participant shall be governed by Section 415 of the Internal Revenue Code and shall not exceed the lesser of (a) $90,000, or (b) 100% of the Participant's average compensation for his high three years. "Compensation" means all remuneration for services performed by the Participant, including salaries, wages, fees, bonuses and commissions, from all Contributing Employers for the Fiscal Year. If the retirement income benefit under the Plan begins before age 62, the determination as to whether the $90,000 limitation set forth above has been exceeded shall be made by reducing the limitation so that such limitation equals an annual benefit which is equivalent to a $90,000 annual benefit beginning at age 62. If the retirement income benefit begins after age 65, the determination as to whether the $90,000 limitation has been exceeded shall be made by increasing the limitation so that such limitation equals an annual benefit which is equivalent to a $90,000 annual benefit beginning at age 65. For purposes of adjusting any benefit or limitation, the interest rate assumption shall be seven percent (7%) per annum or, for Plan years commencing after

21

December 31, 1994, the applicable interest rate as defined in Section 417(e)(3) of the Code. The term "highly compensated employee" means an employee as defined by Section 414(q) of the Code and, for Plan years commencing after December 31, 1997, the term "compensation" has the meaning given such term by Section 415(c)(3) of the Code. For Plan years commencing after December 31, 1994, the amount of $90,000 in this Section shall be adjusted annually for increases in the cost-of-living in accordance with regulations prescribed by the Secretary of the Treasury in accordance with Section 415(d)(1), (2), (3) and (4) of the Code.

**Section 5.10**

(a)    The pension of each Participant will be distributed, beginning not later than the later of April 1 of the calendar year following the later of (l) the calendar year in which the employee attains age 70½ or (2) the calendar year in which the employees retires, over the life of such Participant and a designated beneficiary.

(b)    More than 50% of the actuarial value of any pension benefit under this Plan must be allocated to payments reasonably expected to be made to the Participant during his lifetime.


**ARTICLE VI**

**Designation of Beneficiaries**

**Section 6.01**    Every Participant or Pensioner may designate one or more Beneficiaries, including, but not limited to, his estate or trustee or trustees under his will, to receive his Death Benefit in such shares as he may specify, and may at any time and from time to time change his Beneficiary or Beneficiaries or their shares. All such designations shall be made on forms prescribed

22

and furnished by the Trustees and shall become effective upon receipt by the Trustees.

Section 6.02    In the event that a Participant or Pensioner fails to designate a Beneficiary or Beneficiaries or any Beneficiary designation is not effective in whole or in part for any reason, including, but not limited to, the failure of a Beneficiary to survive the Participant or Pensioner, the Death Benefit of such Participant or Pensioner or the portion thereof in respect of which no Beneficiary is effectively designated, shall be paid to the surviving spouse of such Participant or Pensioner; or if there shall be none, to his descendants surviving him per stirpes; or if there shall be none, to his surviving parents; or if there shall be none, to his estate.

## ARTICLE VII

### Payment of Benefits

Section 7.01    (1)    A Participant or Pensioner or Beneficiary shall furnish such information as the Trustees may require in order to establish his eligibility for a Benefit before he shall be entitled to a Benefit under this Plan, and the Trustees shall be the sole judges of the standard of proof required to qualify for a Benefit.

(2)    Notwithstanding any other provision of this Plan, payment of all Pensions shall commence on April 1 of the calendar year after the Participant reaches age 70½.. All distributions of benefits will be made in accordance with regulations promulgated under Section 401(a)(9) of the Internal Revenue Code, including Section 1.401(a)(9)-2 of said regulations. This subparagraph shall be effective for any Participant who reaches age 70½ on or after January 1, 1988.

Section 7.02    Except as otherwise provided herein, all Pensions will be paid for life beginning on the first day of the calendar month following receipt by the Trustees of written

application therefor, but in no event later than the 60th day after the close of the Fiscal Year in which the Participant terminates his service with all Contributing Employers, or passes his 65th birthday, whichever is later, provided the applicant shall have fulfilled all other requirements, and will continue to and include the month in which death occurs, provided, however, that payments under the provisions of Sections 5.06, 5.07 and 5.08 will be made as therein set forth.

### Section 7.03  Re-employment of Pensioners.

1.    (a)    No Pension Benefit will be paid for any month during which a Pensioner is employed or self-employed in the lithographic industry for 40 or more hours in New York, New Jersey, Connecticut or Pennsylvania.

(b)    No Pension Benefits will be paid for any month during any part of which a Pensioner is employed or self-employed in the lithographic industry anywhere in the United States or Puerto Rico prior to his 65th birthday. However, the pension benefits temporarily suspended for each month during which the Pensioner worked less than 40 hours or worked outside of New York, New Jersey, Connecticut or Pennsylvania shall be totaled and the equivalent thereof shall be repaid to the Pensioner in monthly pension benefits. Payment under such recalculation will begin with the month following the month during which he becomes 65, provided he is not then employed or self-employed in the lithographic industry for 40 or more hours a month in New York, New Jersey, Connecticut or Pennsylvania.  In no event shall such recalculation result in a reduction of the monthly Pension Benefit payable to such Pensioner.

2.    Any Pensioner who becomes employed in the lithographic industry shall not be permitted to increase the amount of his Pension Benefit as a result of the Contributions made on his behalf during such re-employment. Notwithstanding the foregoing, any Participant who retires prior

24

to Normal Retirement Age and thereafter becomes re-engaged in covered employment shall have his pension benefit recalculated to take into consideration contributions made on his behalf prior to Normal Retirement Age.

### Section 7.04  Non-Alienation of Benefits.

1.      No Benefit shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void; nor shall any such Benefit be in any manner liable for or subject to the debts, contracts liabilities, engagements or torts of the person entitled to such Benefit.  However, if any Pensioner or Survivor Annuitant becomes bankrupt or attempts to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge any Benefit hereunder, then such Benefit shall, in the discretion of the Trustees, cease and desist and the Trustees shall hold or apply the same to or for the benefit of such Pensioner, his spouse, children or Survivor Annuitant, or any of them in such manner and in such proportion as the Trustees may deem proper.

2.      Notwithstanding the above, any Pensioner may, by written instrument, assign or alienate the right to future payments, provided such assignments or alienations are voluntary, and revocable, do not in the aggregate exceed ten percent (10%) of the benefit payment, and are neither for the purpose nor have the effect of defraying plan administration costs.

### Section 7.05   With respect to distributions made by the Plan on or after January 1, 1993, and notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this Section, a distributee may elect, at the time and in the manner prescribed by the Plan, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

25

1.      An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Internal Revenue Code of 1986 (the "Code"); and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities).

2.      An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts the distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

3.      A "distributee" includes an employee or former employee. In addition, the employee's or former employee's surviving spouse and the employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Section 414(p) of the Code, are distributees with regard to the interest of the spouse or former spouse.

4.      A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

**Section 7.06  Restrictions on Certain Mandatory Distributions.**

(a)     In general. – For Plan years commencing after December 31, 1994, if the present value of any nonforfeitable accrued benefit exceeds $5,000, such benefit shall not be immediately distributed without the consent of the participant.

(b)     Determination of present value. – For purposes of subparagraph (A), the present value shall be calculated in accordance with Section 417(e)(3) of the Code and Section 205(g)(3) of ERISA.

**Section 7.07**   For Plan years commencing after December 31, 1996, all Distributions of Benefits shall be made and the required beginning date shall be in accordance with Section 401(a)(9)(C) of the Code.

## ARTICLE VIII

### Employer Contributions

**Section 8.01**    Each Contributing Employer shall contribute to the Plan such amounts as may be provided for in the Collective Bargaining Agreement between the Union and the Contributing Employer, or as they may hereafter be amended, and shall forward such Contributions to the Trustees at such time or times as therein provided, together with such information as the Trustees may require. Payment of amounts which are in excess of the amounts provided for in collective bargaining agreements will not entitle a Participant to benefits based on such excess, nor will the payment of contributions on behalf of a person who is not an Employee as defined herein entitle such person to any benefits.

**Section 8.02**    If an Agreement provides that Employer Contributions payable to the Plan are

to be calculated on the basis of the compensation paid by the Employer to the Participant, contributions based upon compensation in excess of $150,000 (as that amount may be adjusted from time to time by the Secretary ~~of the Treasury pursuant to Section 401(a)(17) of the Internal Revenue Code of 1986~~ pursuant to Section 401(a)(17) of the Internal Revenue Code, except that effective for Plan years commencing after December 31, 1994, the base period shall be the calendar quarter beginning October 1, 1993, and any increase which is not a multiple of $10,000 shall be rounded to the next lowest multiple of $10,000), shall not be taken into account for any purpose, including, without limitation, the calculation of the Participant's Normal Pension Benefit under Section 5.01. In determining compensation, the rules set forth at Section 414(q)(6) of the Internal Revenue Code shall apply, except that in applying such rules the term "family" shall include only the spouse of the Participant and any lineal descendants of the Participant who have not attained the age of 19 before the close of the calendar year.

_Section 401(a)(17) Limitation:_  In addition to other applicable limitations set forth in the Plan, and notwithstanding any other provision of the Plan to the contrary, for Plan years beginning on or after January 1, 1994, the annual compensation of each employee taken into account under the Plan shall not exceed the OBRA '93 annual compensation limit. The OBRA '93 annual compensation limit is $150,000, as adjusted by the Commissioner for increases in the cost of living in accordance with Section 401(a)(17)(B) of the Code. The cost-of-living adjustment in effect for a calendar year applies to any period, not exceeding 12 months, over which compensation is determined (determination period) beginning in such calendar year. If a determination period consists of fewer than 12 months, the OBRA '93 annual compensation limit will be multiplied by a fraction, the numerator of which is the number of months in the determination period, and the

denominator of which is 12. For Plan years beginning on or after January 1, 1994, any reference in this Plan to the limitation under Section 401(a)(17) of the Code shall mean the OBRA '93 annual compensation limit set forth in this provision. If compensation for any prior determination period is taken into account in determining an employee's benefits accruing in the current Plan year, the compensation for that prior determination period is subject to the OBRA '93 annual compensation limit in effect for that prior determination period. For this purpose, for determination period beginning before the first day of the first plan year beginning on or after January 1, 1994, the OBRA '93 annual compensation limit is $150,000.

**Section 8.03**    Default in Payment. Nonpayment of any Contributions by an Employer when due shall not relieve any other Employer of its obligation to make payments. In addition to the other remedies to which the parties may be entitled, an Employer in default for ten (10) working days may be required at the discretion of the Trustees to pay such fees, costs and interest as are provided for by the Collective Bargaining Agreement between the Union and the Employer, or if greater, all costs of litigation, attorneys fees, interest at the prime interest rate and liquidated damages of twenty percent (20%) of the delinquency. The Trustees may take any action necessary to enforce payment of contributions, including, but not limited to, action in law and equity and claims in bankruptcy or receivership.

## ARTICLE IX

### Administration

**Section 9.01**    The general administration of this Plan and the responsibility for carrying out the provisions hereof is placed in the Trustees, who may or may not be Participants in the Plan or

Contributing Employers, and who shall be appointed in accordance with the terms of the Agreement and Declaration of Trust.

Section 9.02    The Trustees shall adopt, from time to time, service and mortality tables and a rate of interest for use in all actuarial calculations required in connection with the Plan, and shall appoint actuaries from time to time to serve at their pleasure and to make annual actuarial valuations of the contingent assets and liabilities of the Plan and to certify to each Contributing Employer and to the Union the results of such annual actuarial valuations.

Section 9.03    The Trustees shall have full power to administer the Plan and to adopt forms and rules governing such administration.  The Trustees shall have full discretionary authority to interpret the provisions of the Plan and to pass upon all claims for benefits from the Plan.  The decisions of the Trustees shall be final and binding.

Section 9.04  Claims Review and Appeals Procedure.  The Plan is an employee benefit trust fund, financed by Employer contributions and administered by its Trustees.  Any question of interpretation, construction, application or enforcement of the terms of the Plan or its Trust Agreement, all determinations on benefit claims and appeals, and any and all issues of fact and law, argument or interpretation, are subject to the discretion of the Trustees, whose determinations are final and binding.  If an individual has, or has presented, a claim for benefits under the Plan, the individual may file a request for review of its disposition by appealing to the Trustees of the Plan in writing, within sixty (60) days after receiving written notice of the Plan's action.  The claimant must send the appeal to the Plan office and address it to the Trustees.  The individual will be notified, in writing, of the decision of the Trustees within sixty (60) days of the date the request for review is received, unless there are special circumstances, in which case the claimant will be notified within

one hundred and twenty (120) days. The claimant may appear or be required to appear before the Trustees in connection with the appeal. If additional information is needed, it will be requested by the Plan, and such a request or a personal appearance before the Trustees, will extend the time for decision on a request for review or an appeal. In deciding claims, the Trustees have broad discretion to interpret and apply the terms of this Plan, the Trust Agreement, and any and all issues of fact, law, argument and interpretation. The determination of the Plan will be final and binding if an objection or request for review is not timely filed. The decision of the Trustees of the Plan will be final and binding on any appeal timely presented to it.

## ARTICLE X

### Management of Funds

**Section 10.01** All of the Assets of the Plan shall be held by the Trustees in trust for use in providing the Benefits under the Plan and paying its expenses. No part of the corpus or income shall be used for or diverted to purposes other than for the administration of this Plan and the exclusive benefit of Participants and Pensioners under the Plan. No person shall have any interest in, or right to, any part of the earning of any Assets pertaining to this Plan, nor any rights in or to any part of the Assets thereof, except as to the extent expressly provided in this Plan.

**Section 10.02** The Trustees may appoint a Corporate Trustee for the purpose of investing or reinvesting Assets. The determination of the amount or amounts to be so turned over to the Corporate Trustee, if any, and the conditions under which such Assets shall be turned over, shall rest in the sole discretion of the Trustees. Any direction to the Corporate Trustee shall be in accordance with the Agreement and Declaration of Trust.

31

# ARTICLE XI

## Amendments

**Section 11.01**  Subject to the provisions of Section 11.02, below, provisions of this Plan may be modified or amended by the Trustees retroactively, if necessary, to the extent the Trustees find such modification or amendment necessary to bring the Plan into conformity with governmental regulations expressing the public policy or condition which must be conformed with in order to qualify this Plan as tax-exempt under Sections 401 and 501 of the Internal Revenue Code, as amended.

**Section 11.02**  The provisions of this Plan may also be modified or amended by the Trustees at a regular or special meeting.  The Trustees shall have the power to amend the Plan in any and all respects, provided, however, that no modification or amendment of the provisions of the Plan shall make it possible for any part of the Assets of the Plan to be used for, or diverted to, purposes other than for the exclusive benefit of Participants and Pensioners.

# ARTICLE XII

## Termination

**Section 12.01** The Plan may be terminated by the Trustees only with the consent of the Union and the Employers of a majority of the Participants, and in such event, all the Assets of the Plan shall be used for the exclusive benefit of Participants and Pensioners as of the date of termination of the Plan and shall be allocated in shares determined by the Trustees on the basis of reserve values for the actuarial valuation made in accordance with Section 9.02, in the following order:

32

First, benefits to participants who began receiving benefits at least three (3) years before the termination (including those benefits which would have been received for at least three (3) years if the employee had retired that long before), based on plan provisions in effect five (5) years prior to termination under which such benefits would be the least;

Second, all other benefits insured by the Pension Benefit Guaranty Corporation;

Third, all other nonforfeitable benefits;

Fourth, all other benefits.

Anything herein to the contrary notwithstanding, the rights of all Participants and Pensioners to Benefits accrued to the date of any complete discontinuance of Contributions or termination or partial termination of the Plan, to the extent then funded, shall be nonforfeitable.

**Section 12.02** The Trustees may require that all shares be withdrawn in cash or in immediate or deferred annuities or other periodical payments, as they may determine.

**Section 12.03** In the case of any merger or consolidation with or transfer of assets or liabilities to any other plan, each Participant in the Plan shall receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation or transfer.

**Section 12.04 Missing Participants in Terminated Plans.** For Plan years commencing after January 1, 1996, upon termination of the Plan, benefits of missing participants shall be treated in accordance with Section 4050 of ERISA.

33

# ARTICLE XIII

## Construction

**Section 13.01** The provisions of this Plan shall be administered under the laws of the State of New York.

**Section 13.02** The determination of the Trustees and application of this Plan shall be binding, final and conclusive.

**UNION TRUSTEES**

PATRICK LoPRESTI

ANTHONY CAIFANO

JOSEPH CALDERONE

HAROLD DAVIDHOFF

JOSEPH CURTO

**EMPLOYER TRUSTEES**

FRANK STILLO

GARY SAMUELS

JACK MANGIARCINA

KENNETH J. HOROWITZ

ALFRED NUSSBAUM

*larry/ipp/redlinedplansept21.01*

34

# EXHIBIT

# C

# KENNEDY, JENNIK & MURRAY, P.C.

### ATTORNEYS AT LAW

113 UNIVERSITY PLACE
NEW YORK, NEW YORK 10003
(212) 358-1500
* * *
FACSIMILE (212) 358-0207

THOMAS M. KENNEDY
tkennedy@kjmlabor.com

May 19, 2008

By Fax: (732) 868-0260 and Regular Mail
Unz & Company
201 Circle Drive North, Suite 104
Piscataway, NJ 08854
Attn: Daniel T Scott

Gentlemen:

I represent the Industry Pension Plan which is maintained pursuant to a collective bargaining agreement between the Metropolitan Lithographers Association and Local One-L, GCC/IBT.

A routine review of our files relating to delinquent employers has resulted in a question as to whether your firm was a member of a controlled group with Scott Printing Corporation at the time when Scott ceased to be a contributing employer to the Plan.

Enclosed are copies of the notices of withdrawal liability that were provided to Scott Printing, Inc. in 2005. You will note that they state that the demanded withdrawal liability is payable by Scott and by any members of any controlled group in which Scott is a member. The rules for determining whether an employer is a member of a controlled group are set forth in ERISA and the Internal Revenue Code. At the moment, we are aware that Daniel T Scott is the President of Unz as he was of Scott and that in the past Unz was utilized by Scott to employ pre press employees that would have otherwise been on the payroll of Scott to avoid subjecting them to the Union payroll. That evidence supports an extension of Scott's withdrawal liability to Unz.

Please provide me with evidence of the ownership of the shares of Unz for the three years prior to December 31, 2003 so that we can complete this review.

Thank you for your attention to this matter.

Sincerely,

Thomas M Kennedy